## MORAN, SHUSTER, CARIGNAN AND KNIERIM *v.* ROBERT B. AUGUST

SUPERIOR COURT     JUDICIAL DISTRICT OF     FILE NO. 456076S
HARTFORD-NEW BRITAIN AT HARTFORD

Memorandum filed May 2, 1994

*Hampton & Hampton,* for the plaintiff.

*Henry Ide,* for the defendant.

HON. LEONARD W. DORSEY, STATE TRIAL REFEREE. This is a case tried to the court. The plaintiff, Moran, Shuster, Carignan and Knierim (firm), is a general partnership engaged in the practice of law. The firm is the

successor in interest to August, Moran, Lazorick and Shuster and until March 20, 1991, the firm was known by that name.

Robert B. August is the defendant. Until March 20, 1991, the defendant practiced law as a general partner with the firm and with the firm's predecessor in interest. On March 20, 1991, the defendant withdrew from the partnership.

The defendant had entered into a partnership agreement (agreement) to form the firm's predecessor in interest in April, 1988. Under § 3 of that agreement, each partner had a capital account. On the date of the defendant's withdrawal from the partnership, his capital account had a *negative* balance of $46,699.07. Despite repeated demands, the defendant failed and refused to repay his capital account.

This action was commenced on March 8, 1993. The September 14, 1993 amended complaint is in seven counts. The parties resolved the claims set forth in the fifth and sixth counts of the amended complaint and the plaintiff withdrew those counts prior to trial. The plaintiff proceeded with the first, second, third, fourth and seventh counts of the complaint.

The first count sets forth the defendant's alleged breach of the written partnership agreement for his failure to repay his capital account; the second count asserts the defendant's alleged unjust enrichment arising out of his departure from the firm without meeting his partnership obligations; the third count sets forth the defendant's alleged failure to pay money due and owing to the firm (the firm had transferred the defendant's negative capital account to a receivable of the firm); the fourth count asserts the defendant's alleged enrichment arising out of his failure to pay what was due and owing to the firm; and the seventh count

sets forth the defendant's alleged violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.

The defendant filed a counterclaim dated October 22, 1993. Prior to trial, the defendant withdrew with prejudice paragraphs four (e), (f), (g), (h), (i) and (j) of his counterclaim, leaving the allegations contained in paragraphs four (a), (b), (c) and (d). He withdrew paragraph four (d) on October 27, 1993.

The matter was tried to the court on October 26 and 27 and November 3, 1993. This court finds that the defendant failed to repay his negative capital account under the terms of the agreement.

In April, 1988, the defendant entered into the agreement outlining the terms of the law partnership known as August, Moran, Lazorick and Shuster, the firm's predecessor in interest. Under § 3 of the agreement, a separate and distinct capital account was to be established and maintained for each partner in the partnership. The agreement provides in part: "If a Partner's capital account decreases to less than Ten Thousand ($10,000.00) Dollars then the Partner shall contribute the additional amount necessary to make the account Ten Thousand ($10,000.00) Dollars . . . ."

This court is specially persuaded by the explanation given by the witness Glenn Knierim, an attorney and partner in the firm, as to how the capital accounts were, in fact, structured under the agreement. This court is convinced that all the partners knew of the capital account structure and agreed to its being so structured.

When the defendant withdrew from the firm on March 20, 1991, his capital account had a *negative* balance of $46,699.07. He never repaid his negative capital account to the firm despite its demand.

After the defendant withdrew from the firm, he was no longer a partner of the firm and consequently, from an accounting perspective, he could no longer be part of the capital structure of the firm.

When the defendant withdrew from the firm, his negative capital account was reallocated among the remaining partners and because he owed the money to the firm, it became a receivable of the firm.

The defendant is unjustly enriched by his failure to repay the money he owes to the firm. The right to recovery under the theory of unjust enrichment is equitable in nature, the basis being that, in a given situation, it is contrary to equity and good conscience for one to retain a benefit that has come to him at the expense of another. *CBS Surgical Group, Inc.* v. *Holt,* 37 Conn. Sup. 555, 557–58, 426 A.2d 819 (1981). There is unjust enrichment when a party has benefited and the benefit received is unjust. *Simmons* v. *United States Fidelity & Guaranty Co.,* 35 Conn. Sup. 664, 667, 405 A.2d 675 (1978).

Each year that the defendant was in the partnership, he accepted the Internal Revenue Service schedule K-1 that was prepared for him. He used these schedules in the preparation of his own personal income tax returns and received the tax benefits of being a partner in the firm. He continues to receive those benefits and if his obligation to the firm is forgiven, he would have to recognize income in the amount of $46,699.07. The defendant has done nothing to merit the benefit he has retained. In the meantime, the remaining partners bear the burden of the reallocation of the defendant's negative capital account. They continue to be responsible for the obligation to the firm. The defendant has thus been unjustly enriched at the expense of the remaining partners.

The firm's complaint alleges that the defendant's failure to pay the negative capital account/account receivable as set forth in counts one, two, three and four is an unfair trade practice. This litigation is no more than a dispute between the defendant and his former partners as to the value of his capital account and the defendant's interest in the law firm upon his withdrawal. It is not a dispute between parties that were in any kind of consumer relationship with each other. The complaint does not involve trade or commerce for the purposes of CUTPA.

General Statutes § 42-110g (a) provides in part: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . . Proof of public interest . . . shall not be required . . . ." General Statutes § 42-110b (a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." CUTPA defines trade or commerce as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42-110a (4).

In *Jackson* v. *R. G. Whipple, Inc.*, 225 Conn. 705, 725–27, 627 A.2d 374 (1993), the Supreme Court stated that "although [p]rivate litigation under this act is essential . . . it strains credulity to conclude that CUTPA is so formless as to provide redress to any person, for any ascertainable harm, caused by any person in the conduct of any trade or commerce. Although privity, in the traditional contractual sense of an exchange of consideration between parties, may no longer be essential for standing under CUTPA, *a claim-*

*ant under CUTPA must possess at least some type of consumer relationship with the party who allegedly caused harm to him or to her.* CUTPA was, after all, enacted by the legislature to put Connecticut in the forefront of state consumer protection . . . ." (Emphasis added; internal quotation marks omitted.)

*Jackson* involved a claim by an aggrieved party against the attorney representing an opposing party and is not directly on point. There is, however, a Superior Court case directly on point that holds that attorney-partnership disputes are outside the scope of CUTPA litigation. In *Chester* v. *Schatz & Schatz, Ribicoff & Kotkin,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 447376 (June 3, 1992) (7 C.S.C.R. 721), the court held that an attorney-partnership dispute was comparable to the employer-employee relationship, which is clearly outside the scope of CUTPA. The court found no Connecticut cases directly on point, but, to some extent, relied on employment cases.

In *Heller* v. *North American Rock Co.,* Superior Court, judicial district of Stamford-Norwalk, Docket No. 93432 (February 6, 1991) (6 C.S.C.R. 272), the court found that CUTPA's trade or commerce definition does not apply to claims arising from an employment relationship because it does not apply to the internal business affairs and workings of a partnership. The court held in *Chester* v. *Schatz & Schatz, Ribicoff & Kotkin,* supra, 7 C.S.C.R. 722, that " 'internal strife of a partnership' " does not arise in trade or commerce and does not cause substantial demonstrable injury to consumers, competitors or other businessmen. The dispute between the defendant and his former partners is simply not a consumer transaction; it is, in fact, a litigation arising out of the internal workings of a partnership.

Recently, the Appellate Court held that where "[t]he relationship . . . is not between a consumer and a commercial vendor, but rather between an employer and an employee . . . . the employer-employee relationship does not fall within the definition of trade or commerce for the purposes of an action under CUTPA." *Quimby* v. *Kimberly Clark Corp.,* 28 Conn. App. 660, 670, 613 A.2d 838 (1992).

Even if this court were to conclude that the dispute at issue in this litigation involved "the conduct of trade or commerce," in order to determine whether the practice violated CUTPA, it would need to apply the following criteria established by the Supreme Court: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other business-men)]. . . ." (Internal quotation marks omitted.) *Daddona* v. *Liberty Mobile Home Sales, Inc.,* 209 Conn. 243, 254, 550 A.2d 1061 (1988). This three-pronged test requires not only that the conduct complained of be consumer related, but further requires that it be either offensive of public policy or immoral, unethical, oppressive or unscrupulous. "Thus, a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." (Citation omitted; internal quotation marks omitted.) Id.

The conduct that the firm complains of here is no more than the defendant's claim that he does not owe a negative capital account to the firm. The firm has failed to establish any of the elements necessary to

prove an unfair trade practice. There was no evidence offered to establish that the firm's claim for the negative capital account was a "consumer transaction," nor was there any evidence elicited that the conduct complained of was unscrupulous, unfair, unethical or in contravention of public policy. The firm may not recover under count seven, which alleges a CUTPA violation.

The defendant is not entitled to repayment of his capital account or to any loan in excess of his capital account. His capital account had a negative balance and for three years he accepted that he had a negative capital account with the firm. Without obligation, he accepted the schedule K-1s that were prepared for him and he used these forms in preparing his own personal tax returns. The defendant now maintains that if the firm had utilized an accounting method different from the one it adopted, his capital account would not be negative. This court is not persuaded by any of the defendant's claims.

The firm, from its inception, utilized a cash basis method of accounting. An accrual based method of accounting is not a method that makes sense for a cash dependent service business such as a law firm. Even if it is assumed, arguendo, that one were moved to attempt to utilize the accrual method basis of accounting, the data presented simply does not exist to support the defendant's assertions. The attempt at reconstruction by Ronald Bucchi, a certified public accountant, was partial. It was based on incomplete information provided by the defendant, and lacked any independent verification whatsoever. Given the information available, it would not be possible to create an accrual based analysis that met any reasonable accounting standard. There can be no doubt, however, that the firm and its predecessors utilized a cash basis method of accounting. The defendant's capital account was negative in 1988. It remained negative in 1989 and was

still negative in 1991, when he withdrew from the firm. He had no capital account to be repaid. Therefore, no loan existed.

The defendant is not entitled to compensation pursuant to § 19 of the agreement. He withdrew, he did not retire.

In paragraph four (d) of his counterclaim, the defendant claimed compensation pursuant to § 19 of the agreement. Section 19 sets forth a structure for compensating a partner who retires from the partnership. Section 19 does not apply in this case. In his testimony, the defendant admitted that he withdrew from the firm and began a firm of his own. The defendant himself clearly admitted that he did not retire.

The defendant is entitled to compensation in the amount of $2400 under § 17 of the agreement. Section 5B of the agreement provides for the calculation of compensation for a withdrawing partner. Section 17 of the agreement provides that a "withdrawing Partner shall be entitled to continue to receive compensation and must pay compensation to the Partnership, under Section 5 of this Agreement, for a period of two (2) years from the date of his withdrawal."

Section five of the agreement is entitled "Profits." The partners amended this section effective October 1, 1989. Section 5B, as amended, outlines how a partner's "share" of the profits is to be calculated. Section 5B (a) of the agreement provides: "Each Partner's 'share' of profits for the accounting period shall be equal to the percentage which the Partner's net production bears to the total net production of all Partners." Section 5B (b) of the agreement provides: "The Partner's 'share' is multiplied by the net of cash receipts less all costs, overhead, and the Partner's draws as calculated above, for the accounting period, to determine the dollar amount of profits for the period."

Under § 17 of the agreement, the defendant is entitled to be compensated for the period between March 20, 1991, through March 20, 1993, in accordance with the calculation provisions set forth in § 5, as amended. Utilizing the firm's production reports, Knierim, one of the firm's partners, performed these calculations and arrived at a figure of $2400. Under § 17 of the agreement, the defendant is entitled to be compensated in the amount of $2400.

The defendant withdrew from the firm on March 20, 1991. At the time of his withdrawal, his capital account had a negative balance of $46,699.07. The defendant never repaid his capital account despite the firm's demand. The account became a receivable of the firm and despite a clear obligation to do so, the defendant failed and refused to pay the money due and owing to the firm. In the meantime, the defendant has been unjustly enriched at the expense of the firm through his failure to repay the money due and owing.

While the defendant is entitled to compensation in the amount of $2400 under § 17 of the partnership agreement, he should not be permitted to continue to avoid his obligation to the firm in connection with his negative capital account.

Judgment is rendered for the plaintiff in the amount of $44,299.07 on the amended complaint except as to count seven. On count seven alleging a violation of CUTPA, judgment is rendered for the defendant. On the defendant's counterclaim, judgment is rendered for the plaintiff.