[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter, concerning the plaintiffs' claims and the defendant's counterclaims, was tried to the court on September 11, 12 and 13, 2001. Thereafter, the parties submitted post-trial briefs, the last of which was filed on November 13, 2001 (#127). After considering the evidence and the arguments of the parties, the court issues this decision.
 I. PROCEDURAL BACKGROUND
The plaintiffs, Whitney R. and Susan G. Fielding, commenced this action by a six count complaint, dated November 14, 1996. In the first count, the plaintiffs allege that they owned premises located at 48 Town Farm Road, in East Hampton, Connecticut, which were destroyed by fire in February, 1995. They claim that, thereafter, the defendant, Roberta Spinnato, doing business as Statewide Renovations,[1] engaged in negotiations with them concerning reconstruction of the fire-damaged premises. The Fieldings allege that, on or about August 22, 1995, they made a deposit of $25,000.00 to the defendant, "with the understanding that a formal written contract would follow after the negotiations on the scope of work, price, materials and time frame were agreed to between the parties." (See complaint, first count, ¶ 5.) They further assert that, six days later, on August 28, 1995, they orally notified Spinnato that they were terminating the negotiations and they requested he return of their deposit. They contend that, in view of Spinnato's refusal to return the deposit, she has been unjustly enriched at their expense. CT Page 16522
In the succeeding counts, certain of the factual allegations of the first count are incorporated by reference in order to set forth other claims. The second count seeks recovery based on conversion. In the third count, the Fieldings claim that Spinnato promised to draw up necessary documents, but that her representations were false, "in that the documents were never prepared or presented to the plaintiffs." (See complaint, third count, ¶ 8.) In the fourth count, they assert that Shapiro's conversion of the deposit was an unfair trade practice, in violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110, et seq. Likewise; in the fifth count, they plead that her failure to return the deposit violated CUTPA. Finally, in the sixth count, they allege that the claimed false representations concerning the "necessary documents" also constituted an unfair trade practice under CUTPA.
In response, Spinnato filed an answer, special defenses and counterclaims, dated July 13, 1998.[2] In her first counterclaim, Spinnato alleges that she and the plaintiffs entered into a written contract, dated April 5, 1995, concerning the reconstruction of the Fieldings' home, located at the premises. She claims that, pursuant to the contract, she performed various services. (See first counterclaim, ¶ 6.) She contends that, during September of 1995, the Fieldings breached the contract, causing her to incur damages. In her post-trial memorandum, Spinnato withdrew her second and third counterclaims, for unjust enrichment and fraud. (See defendant's post-trial memorandum, #126, p. 21.)
The Fieldings filed a reply to Spinnato's special defenses and an answer to her counterclaims, dated September 28, 1998 (#116). The answer to the first counterclaim denies its salient allegations. No special defenses were pleaded in response to the counterclaims.
At trial, the court heard testimony from the following witnesses: the Fieldings; Spinnato; Bernard White, who prepared drawings of the house for the defendant; and Sirreno A. Scranton, a claims adjuster, who represented the Fieldings' insurance carrier in connection with their insurance claims resulting from the fire damage. In addition, the court received various documents as exhibits.
 II. FACTS
The court finds the following facts and credits the following evidence, except as noted. The Fieldings' home, a contemporary, post and beam house in a wooded setting, occupying approximately 2650 square feet, was completely destroyed by fire on February 21, 1995. The damage CT Page 16523 was so complete that nothing remained of the original home that could be repaired. On April 5, 1995, the Fieldings met with Spinnato, and with her representatives, Raymond Ranciato, and Peter Ranciato, to discuss making claims to the Fieldings' insurance carrier concerning their fire loss and concerning rebuilding their home.
On that date, they executed four documents (Exhibits 2, 3, 4, and 5), all of which were on Forms presented by Spinnato, as Statewide Renovations. Each of these documents is headed "STATEWIDE RENOVATIONS"; below, the words "INSURANCE CONSTRUCTION DIVISION" follow. Exhibit 2 is entitled "MULTI-SERVICES CONTRACT" and was also executed by Spinnato. This agreement authorized Statewide to commence "[t]emporary repairs of electrical, water, gas utilities." (See Exhibit 2, ¶ 2.) Paragraph 3 of the agreement authorized Statewide to "commence work of the following services as checked off': "[r]epairs of/reconstruction of building(s) at above address — work agreement, specifications listed per CT contractors law will follow based upon agreement with owner(s)." No work agreement or specifications accompanied the multi-services contract, Exhibit 2. As Whitney Fielding acknowledged in his trial testimony, since the old house was destroyed, this provision referred to building a new house. (See transcript of September 12, 2001, pp. 28, 38-39.)
In addition, this agreement authorized Statewide to estimate and replace landscape items as damaged by the loss (Exhibit 2, ¶ 4). Paragraph 5 states the owners' agreement to have Statewide named by their insurance carrier as an additional payee on checks issued to cover items which were checked off above. It also states, "STATEWIDE RENOVATIONS will do repairs of/reconstruction of above loss for the amount negotiated by and agreed to, in writing by, owner(s), insurance carrier, and STATEWIDE RENOVATIONS."
Paragraphs 6, 7, and 8 of the agreement each state that Statewide will provide "Complimentary Service," including, respectively, on site personal property inventory, computerized compilation of owner's damaged personal property items, and "coordinate pack out and storage of personal property items." (See Exhibit 2.)
Exhibit 3 states that the Fieldings are utilizing Statewide's services as a contractor, but that Statewide "has not advised us in any facets of our claim, other than explaining the services they offer. Upon completion of Statewide Renovations [sic] services, we will present our claim to our insurance carrier for adjustment."
Exhibit 4, entitled "DIRECTION OF PAY," lists the Fieldings insurance carrier as "Patrons Mutual Ins. of CT" (Patrons Mutual). Under description of job duties, the following appears: "rebuild home damaged CT Page 16524 in total per above loss date to agreed specifications with owners." In Exhibit 4, the Fieldings authorized their insurance carrier and their mortgage company to pay Statewide for work performed at the premises' address. No specifications accompany this document.
The final document which the Fieldings signed on April 5, 1995, Exhibit 5, is entitled "NOTICE OF CANCELLATION." It advises them that they can cancel "this transaction" within three business days.
At the April 5, 1995 meeting, Peter Ranciato explained to the Fieldings that the purpose of these documents was to start a procedure which would allow Statewide to present them with an estimate for the repair or the rebuilding of the house, a scope of work, and a contract for the rebuilding. At the time the documents were signed, no price for the reconstruction, no start date, no completion date, no scope of work, and no materials to be utilized in the reconstruction were agreed to by the Fieldings. They never came to agreement with Statewide as to those terms. Also, no other signed agreements between the Fieldings and Statewide were created.
Statewide assisted the Fieldings in compiling the list of personal property they lost in the fire, as a complimentary service, pursuant to the agreement, Exhibit 2. Statewide, through White, prepared drawings, with the Fieldings' input, in order to re-create the plan of the house which was destroyed and to plan for the construction of the house that was to replace it. In order to facilitate the presentation of the insurance claim, the Fieldings provided Statewide with drawings of the old house and the new house. (See Exhibits 15 and 16.) When Whitney Fielding noted that he was not going to pay for the drawings which White was preparing, he was informed by White that this service was provided by Statewide, and that the Fieldings would not have to pay for it. In addition, Peter Ranciato stated to Whitney Fielding that the Fieldings were not paying for the services of an architect.
Statewide prepared an estimate of the cost of rebuilding the home. (See Exhibit A.) In contrast to the previous house which was built on pillars, the new house was planned to be placed on a foundation. (See exhibits 8, L, M, N, O, and P.)
In July, 1995, after a meeting on July 14, 1995, attended by Whitney Fielding; Spinnato; the Ranciatos; William R. Allen, an employee of W. R. Allen Co., a contractor engaged by Patrons Mutual to estimate the rebuilding costs; and Scranton, the Fieldings reached agreement with Patrons Mutual regarding payment for the loss of their home. (See Exhibit 6 and Exhibit J.) By check dated August 17, 1995, they were paid $241,317.62. (See Exhibit 7.) In addition, they received approximately CT Page 16525 $85,000.00 as payment for the personal property loss they suffered as a result of the fire.
On August 21, 1995, the Fieldings met with Peter Ranciato and Spinnato. At that time, Statewide presented to the Fieldings a binder containing documents, entitled "Fire Damage Reconstruction Repair Project Breakdown" (Exhibit 8) (Hereinafter, the "breakdown"). In addition to copies of Exhibit 2 (the multi-services contract) and Exhibit 4 (the direction of pay), it contained a payment schedule, additional contract language, and a scope of work for the construction of the new house. At the meeting, the Fieldings declined Statewide's request for an initial payment of $95,000.00. Statewide then asked the Fieldings to pay to Statewide a deposit, as a show of good faith, while they reviewed the breakdown. The participants left the meeting with the understanding that Susan Fielding would give a good faith deposit to Statewide the next day.
On the next day, August 22, 1995, Peter Ranciato telephoned Susan Fielding at her place of work and renewed Statewide's request for a check for $95,000.00, which was declined again. Susan Fielding said she would provide a check for $10,000.00, which Peter Ranciato said was unacceptable. He told her that would mean the end of Statewide's work with the Fieldings. She then proposed to pay the sum of $25,000.00 and she and Peter Ranciato agreed that that amount would show good faith.
Susan Fielding then walked to her bank and had a check drawn for $25,000.00. She then went outside and Spinnato and Peter Ranciato drove up. Ranciato then confirmed to Susan Fielding that the purpose of the check was to show good faith. Susan Fielding gave the check to Spinnato. (See Exhibit 12.) The check was a gesture of good faith to indicate that she and her husband would continue to talk about the contents of the breakdown, with the hope that issues concerning the building of the new house could be worked out with Statewide in the future. The issues were never worked out and the parties never came to agreement about them.
Whitney Fielding asked his brother-in-law, Owen Choinere, who has a contractor's license, to look it over the breakdown. After review of the breakdown, Whitney Fielding concluded that it had various deficiencies. For example, there was no description of the type of heating system which would be used, other than "a hot air furnace or hydro air system. . . ." (See item 24 in Addendum, part of Exhibit 8.) The number of doors to be installed in the house was not clearly set forth. (See item 13 in Addendum, part of Exhibit 8.) The grade of tile to be provided was not clearly specified, other than as "ceramic." (See items 39 and 40 in Addendum, part of Exhibit 8.) The breakdown did not address landscaping. CT Page 16526
On August 28, 1995, Whitney Fielding received the breakdown back from Choinere, who had made numerous penciled in comments on it. (See Exhibit 8.) On the next day, August 29, 1995, early in the morning, when he was at his place of work at the post office, Fielding received a telephone call from Peter Ranciato. He informed Ranciato that he had many reservations about the breakdown and that there were various issues to be cleared up. He advised Ranciato that he had made an appointment with an attorney in order to have a contract prepared which did not leave the Fieldings exposed to additional expenses and afforded them protection. He told Ranciato that, until the issues were resolved, Statewide was to do nothing. Ranciato became irate, and responded with profanity and threats, such as "I'm going to get you for this" and "you f____, you got some real long hair with all your money in the bank but I'm about to cut it real short." (Expletive deleted.)
Fielding was upset by this conversation and left work early in the afternoon. He drove to the site of the fire damage and found that, without his permission, Statewide had placed a forty foot dumpster there. He then went to the Town of East Hampton building department and found that Statewide had just left there after, also without his permission, filing a building permit concerning the premises. (See Exhibit 9.) He advised the Town not to process the application without his consent. The Town then sent a letter to Statewide, dated August 30, 1995 (Exhibit K), stating that the application could not be accepted without the owner's consent, and returning the application and plans which had been submitted.
Fielding then met with his attorney and told him that the Fieldings did not want to do business with Statewide. The attorney then sent a letter to Statewide to that effect, seeking the return of the deposit. (See Exhibit 10.)
Besides filing the building permit application, after August 22, 1995, the date when Spinnato received the check from Susan Fielding, the only things Statewide claims to have done in connection with the project was to meet at the site once with an asbestos removal company and to arrange for a dumpster to be brought to the site.
Ultimately, the Fieldings decided not to have the new house built. Instead, they purchased an already-built home. This action ensued.
The court notes that, in general, it does not credit the testimony offered by Spinnato. Her recollection of events was vague. For example, she could not recall when Exhibit B, her schedule of expenses she is claiming on her counterclaim, was prepared. While she assumes that she prepared it herself, she has no recollection of having done so. Her CT Page 16527 credibility was diminished also by the absence of documentation supporting the amount of time she claims that she, herself, spent on the project.[3] Likewise, her claims of payments made in connection with this project, to Raymond Ranciato and Mark Mastroianni, an employee, were not supported by documentation, such as checks.[4] Other facts are set forth below by the court in the context of its discussion of the issues.
 III. DISCUSSION A. Plaintiffs' Claims 1. Unjust Enrichment
As noted, in their first count, the plaintiffs seek recovery of their $25,000.00 deposit on the ground of unjust enrichment. "The right of recovery for unjust enrichment is equitable, its basis being that in a given situation it is contrary to equity and good conscience for the defendant to retain a benefit which has come to him at the expense of the plaintiff. . . . Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy." (Internal quotation marks and citations omitted.) Polverati v. Peatt, 29 Conn. App. 191, 200,614 A.2d 484, cert. denied, 224 Conn. 913, 617 A.2d 166 (1992). "Unjust enrichment is a legal doctrine to be applied when no remedy is available pursuant to contract." Ayotte Brothers Construction Co. v. Finney,42 Conn. App. 578, 581, 680 A.2d 330 (1996). "The doctrine's three basic requirements are that (1) the defendant was benefited, (2) the defendant unjustly failed to pay the plaintiff for the benefits, and (3) the failure of payment was to the plaintiff's detriment. . . . All the facts of each case must be examined to determine whether the circumstances render it just or unjust, equitable or inequitable, conscionable or unconscionable, to apply the doctrine." (Citation omitted.) Gagne v.Vaccaro, 255 Conn. 390, 409, 766 A.2d 416 (2001).
 a. The Home Improvement Act
In their post-trial memorandum of law, the plaintiff's claim that the defendant was benefitted by obtaining the $25,000.00 deposit without complying with the Home Improvement Act, General Statutes § 20-418, et. seq (the Act), specifically § 20-429.[5] They contend that the multi-services contract (Exhibit 2) does not comply with the statute.
Lack of compliance with the Home Improvement Act may not be utilized to support a cause of action. "The Home Improvement Act provides a homeowner with a defense. It cannot be used as an offensive weapon. It merely invalidates a contract from being enforced." (Internal quotation marks omitted.) Faragasso v. Degeorge Home Alliance, Inc., Superior Court, CT Page 16528 judicial district of Stamford/Norwalk at Stamford, Docket No. 162664 (Dec. 7, 1998, D'Andrea, J.)
The Act does not apply in the circumstances at issue, since the Act does not pertain to the construction of a new home. General Statutes § 20-419 (4) provides: "`Home improvement' does not include: (A) The construction of a new home. . . ." In the same context as that at issue here, that of destruction of a prior residence and a contract concerning construction of its successor, the court in Areis Financial Corp. v.Stafford, Superior Court, judicial district of New Haven at New Haven, Docket No. 309477 (September 13, 1995, Quinn, S.T.R.) found that the agreement at issue concerned a new home, not a repair or replacement, as provided in General Statutes § 20-419 (4),[6] making the Act inapplicable. There, the court noted that the second house was larger than the first. See id.
Here, as described above, Whitney Fielding acknowledged that his prior house was completely destroyed and a new home was contemplated. Also, the proposed new home was to be built on a foundation, not on pillars. Thus, this case differs from Seaport Electric v. Friedlander, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket Nos. 120366 and 112554 (May 24, 1993, Mottolese, J.), where a portion of the prior home remained after the new work was finished. Also, in contrast to the evidence here, the proof there was to the effect that the architect involved considered the project to be an alteration and the building permit and certificate of occupancy termed it a remodeling. See id.[7]
 b. No Meeting Of The Minds
The Fieldings claim also that they are entitled to the return of the $25,000.00 payment they made because it was tendered as a good faith deposit, not a payment made due to a contractual obligation. The court agrees. Under the circumstances, they have satisfied the required elements of an unjust enrichment claim.
"The existence of a contract is a question of fact to be determined by the trier on the basis of all the evidence. . . . To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. . . . To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties. . . . If the minds of the parties have not truly met, no enforceable contract exists. . . . [A]n agreement must be definite and certain as to its terms and requirements. . . . So long as any essential matters are left open for further consideration, the contract is not complete." L R Realty v. Connecticut National Bank,
CT Page 1652953 Conn. App. 524, 534-535, 732 A.2d 181, cert. denied, 250 Conn. 901,734 A.2d 984 (1999). "An agreement to agree to a material term at a later time is no agreement at all." Lizotte v. Town of Enfield, Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. 367352 (August 31, 1999, Sheldon, J.).
At the time the deposit was made, the only agreement between the Fieldings and Statewide was the multi-services contract (Exhibit 2). That agreement does not contain the typical terms of a building construction contract. By its terms, that agreement provided that "work agreement, specifications listed per CT contractors law will follow based on agreement with owner(s)." While Statewide eventually presented a proposed payment schedule and a scope of work to the Fieldings (Exhibit 8), the record reflects that the plaintiffs never agreed to them. Accordingly, the parties never agreed to a contract under which Statewide was engaged to build the new house.[8]
When the Fieldings presented their check, it was not pursuant to any binding agreement, or to express assent to the breakdown presented by Statewide. Rather, it was a good faith gesture, showing their willingness to continue to work towards an agreement on the project. The implication was that, if an agreement did not eventuate, the money would be returned. When Peter Ranciato made his telephone comments to Whitney Fielding, which were followed by Fielding's discovery that the dumpster had been placed and that a permit had been sought, both without permission, the Fieldings were within their rights to terminate the negotiations with Statewide and to seek the return of the deposit. SeeFowler v. Weiss, 15 Conn. App. 690, 693-694, 546 A.2d 321, cert. denied,209 Conn. 814, 550 A.2d 1082 (1988).
The evidence established that (1) the defendant received the benefit of the $25,000.00 payment, (2) the defendant unjustly declined to return it, and (3) the failure of payment was to the plaintiffs' detriment. Where parties do not come to an enforceable agreement, a deposit paid in contemplation of the same ought to be returned. See Luttinger v. Rosen,164 Conn. 45, 47-48, 316 A.2d 757 (1972); Feinberg v. Berglewicz,32 Conn. App. 857, 632 A.2d 709 (1993).
The defendant cites Wolf's New Process Abrasive Wheel, Inc. v. Resnik,16 Conn. Sup. 415, 417 (1950), for the proposition that a voluntary payment may not be recovered, "regardless of whether the contract between them is void or illegal." (See defendant's post-trial memorandum of law, p. 14.) There, the court stated that "[t]he general rule as to executed contracts is that if the parties be in pari delicto they be left where they have placed themselves." Id. Further, the court noted that "[w]here payments are made under a void or illegal contract they cannot be recouped CT Page 16530 if they were voluntarily made." Id. Here, as noted above, the multi-services contract was neither void nor illegal. It simply contemplated a subsequent agreement, which never came to fruition.
Likewise, the payment was not made in response to an illegal demand premised on an already extant contractual obligation in order to secure a benefit, such as the release of a mortgage. See Crittenden v. Royce,100 Conn. 617, 621, 124 A. 215 (1924) (also cited by the defendant). Similarly unavailing is the defendant's reliance on language in Morrisv. New Haven, 78 Conn. 673 (1906). There, the Supreme Court stated, in the context of an action seeking to recover monies paid under protest in response to a tax bill, "[a] party cannot recover money voluntarily paid with a full knowledge of all the facts, although no obligation to make such payment existed." Id., 675. Except for Wolf's New Process AbrasiveWheel, Inc. v. Resnik, supra, a 1950 Superior Court decision, the most recent citations to Morris v. New Haven, supra, were in Pitt v.Stamford, 117 Conn. 388, 392, 167 A. 919 (1933), and in Savings Bank ofRockville v. Wilcox, 117 Conn. 196, 200, 167 A. 713 (1933), both in the context of efforts to recover taxes paid, not in the situation found to exist here, that of parties in the process of contract negotiation.
As noted above, this court has found that the defendant, through Peter Ranciato, in Spinnato's presence, confirmed to Susan Fielding that the money she was paying was a good faith deposit, nothing more. Thus, here, a full knowledge of the facts meant that it was the parties' implied understanding, in accordance with applicable Connecticut law, cited above, that it would wrong for the recipient to retain the money if no agreement was reached. After all, the only service which the defendant claims to have performed after receiving the money was to attend a single meeting with an asbestos removal company. The unauthorized placing of the dumpster and the unauthorized filing of the permit application can hardly be considered benefits to the Fieldings.
Under all the circumstances, the defendant should have returned the deposit. The Fieldings are entitled to judgment on the first count of the complaint.
 2. Conversion
In their second count, the plaintiffs also seek recovery of the deposit, on the ground of conversion. "The tort of [c]onversion occurs when one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights." (Emphasis in original, internal quotation marks omitted.) Hi-Ho Tower,Inc. v. Com-Tronics, Inc., 255 Conn. 20, 43, 761 A.2d 1268 (2000). "The intent required for a conversion is merely an intent to exercise dominion CT Page 16531 or control over an item even if one reasonably believed that the item is one's own." Plikus v. Plikus, 26 Conn. App. 174, 180 (1991).
For the reasons set forth above, in connection with the first count, the plaintiffs have proved that the defendant is liable to them for converting the deposit. Judgment may enter in favor of the plaintiffs on the second count.
In addition, the plaintiffs are entitled, under the first and second counts, to an award of interest under General Statutes § 37-3a,[9]
since the defendant wrongfully withheld their money after its return was demanded. "It is clear that Connecticut case law establishes that prejudgment interest is to be awarded if, in the discretion of the trier of fact, equitable considerations deem that it is warranted."(Internal quotation marks omitted.) Aubin v. Miller, 64 Conn. App. 781, 798,781 A.2d 396 (2001). The circumstances here, described above, warrant such an award.
Interest is assessed from the date the money became due and payable. See West Haven Sound Development Corp. v. West Haven, 207 Conn. 308,321, 541 A.2d 858 (1988). The plaintiffs have not had the use of their money for over six years. They demanded return of the deposit in their attorney's letter of September 5, 1995 (Exhibit 10.) With an allowance of a reasonable time to respond, the deposit should have been returned no more than thirty days later, or by October 5, 1995. Calculated from that date, at the rate of 10% per year, the interest on $25,000.00, through the date of this decision is $15,479.50.[10]
 3. Fraud
In the third count, the plaintiffs seek recovery based on claimed fraud. "The essential elements of a cause of action in fraud are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury. . . . All of these ingredients must be found to exist; and the absence of any one of them is fatal to a recovery. . . . Additionally, [t]he party asserting such a cause of action must prove the existence of the first three of [the] elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as `clear and satisfactory' or `clear, precise and unequivocal.'" Anastasia v. Beautiful You Hair Designs, Inc.,61 Conn. App. 471, 477, 767 A.2d 118 (2001).
In the third count, paragraph 6, the plaintiffs allege that the defendant "represented to the plaintiffs that it would draw up all CT Page 16532 necessary documents necessary to repair the premises." In paragraph 7, they allege that, "[r]elying on these representations the plaintiffs tendered a $25,000.00 check to the defendant to be held in escrow pending all the necessary documents." Further, the plaintiff's claim that "[t]he representations of the defendants above were false at the time the defendant made them in that the documents were never prepared or presented to the plaintiffs." (See complaint, third count, ¶ 8.)
Drawing up the "necessary documents" depended upon the parties entering into a contract concerning the new house. Clearly, the defendant presented terms which were unacceptable to the Fieldings. The fact that the parties never came to an agreement does not amount to fraud.
In their post-trial memorandum, pp. 12-13, and in their reply memorandum, p. 14, the plaintiffs advance a different factual basis for their fraud claim than was alleged in their complaint. They assert that implicit in the defendant's representation that a check was necessary while the parties worked toward a complete contract was that the deposit would be returned if agreement could not be reached, but "the defendant never had any intention of returning the deposit to the plaintiffs if all necessary aspects of the contract could not be worked out. The plaintiffs acted in good faith in providing the deposit and relied on the statements of the defendant regarding the need for a "good faith deposit' to their detriment." (See plaintiffs' post-trial memorandum of law, pp. 12-13.) As stated above, in their complaint, the alleged false representation was that the necessary documents would be prepared, not that the defendant misrepresented the purpose of and her intentions concerning the deposit.
"Pleadings have their place in our system of jurisprudence. While they are not held to the strict and artificial standard that once prevailed, we still cling to the belief, even in these iconoclastic days, that no orderly administration of justice is possible without them. . . . The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to prevent surprise. . . . The principle that a plaintiff may rely only upon what he has alleged is basic. . . . It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint. . . . A plaintiff may not allege one cause of action and recover on another. Facts found but not averred cannot be made the basis for a recovery." (Internal quotation marks and citations omitted.) Bartomeli v. Bartomeli, 65 Conn. App. 408,412, ___ A.2d ___ (2001). The court may not premises a finding of fraud on facts which were not alleged in the complaint.
The plaintiffs have not proved the allegations of the third count. Judgment may enter for the defendant on the third count. CT Page 16533
 4. CUTPA
In their fourth, fifth, and sixth counts, the plaintiffs seek recovery under CUTPA. "Section 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the "cigarette rule' by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other business persons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Footnote omitted; internal quotation marks omitted.) Hartford Electric Supply Co. v. Allen-Bradley Co., 250 Conn. 334,367-68, 736 A.2d 824 (1999).
The plaintiffs advance several theories under which they claim entitlement to relief under CUTPA. Since the court has determined that the Home Improvement Act (the Act) does not apply here, the court finds unpersuasive their contention that they have proved a CUTPA violation based on a violation of the Act. See General Statutes §20-427 (c).[11]
In the fourth and fifth counts, the plaintiffs plead that the conversion of the deposit, and the failure to return it, amount to violations of CUTPA. While it is true that a majority of the decisions of the Superior Court have found that a single transaction may give rise to a CUTPA violation, it is not the case that every commission of a tort gives rise to CUTPA liability. "The majority of Superior Court decisions have held that a litigant does not need to allege more than a single act of misconduct in order to bring an action under CUTPA." Roache v.Rogers, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 314114 (July 26, 1999, Skolnick, J.). See also Four BeachesCondo v. W. C. Brescia Plumbing and Heating, Inc., Superior Court, judicial district of New Haven at New Haven, Docket No. 384124 (May 23, 1997, Licari, J.). This court finds most persuasive the reasoning of those cases that have determined that a CUTPA violation can be based upon a single act of misconduct.
Our Supreme Court has found, for example, that, under certain CT Page 16534 circumstances, negligence may not constitute a basis for a CUTPA violation. See Haynes v. Yale-New Haven Hospital, 243 Conn. 17, 33-34, 699 A.2d 17 (1997). Every case of unjust enrichment does not constitute a CUTPA violation. A recent example is provided by Moran, Shuster, Carignan Knierim v. August, 43 Conn. Sup. 431, 657 A.2d 736 (1994), affirmed on other grounds, 232 Conn. 756, 657 A.2d 229 (1995). There, a former partner of a law firm failed to repay money he owed to the firm, resulting in a finding that he had been unjustly enriched. See id., 434. The firm claimed that his failure to pay also was an unfair trade practice. See id., 435. Despite the finding of unjust enrichment, the court found that the plaintiff had not proved "that the conduct complained of was unscrupulous, unfair, unethical or in contravention of public policy." Id., 438.
Similarly, it is not clear that every case of conversion implicates CUTPA. "[I]t is unclear whether a CUTPA violation is established when a conversion, while wrongful, is nevertheless based on a mistake, without malice." Mohican Valley Concrete, Inc. v. Wade, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 321003 (October 14, 1997, Stevens, J.) (20 CLR 527).
The facts here demonstrate that the parties entered into an initial agreement (Exhibit 2), which contemplated a subsequent agreement, and then worked together to facilitate the presentation of the Fieldings' insurance claims to their insurance carrier. Under this agreement, Statewide put in time, did work, and provided services to the Fieldings. Then, after the Fieldings received the insurance payment concerning the destruction of their home, Statewide presented the breakdown, Exhibit 8, which the Fieldings found unacceptable. The parties then agreed on the deposit, an amount far less than the $95,000.00 initial payment proposed in the breakdown. Then, they had a falling out. While the court certainly does not condone Peter Ranciato's remarks on the telephone to Whitney Fielding, this situation amounts to a dispute between contracting parties who had worked together for several months towards a common end, but then went their separate ways. The defendant should have returned the deposit when it was sought, but apparently did not under the mistaken belief that she was entitled to be paid. While, as discussed below, the court does not credit her counterclaim, there is no doubt that the Fieldings were assisted in the presentation of their insurance claims, and, therefore, in the advancement of their interests, by the defendant's efforts on their behalf. Under the circumstances, the plaintiffs have not satisfied either of the first two prongs of the "cigarette rule" as to their fourth and fifth counts.
As discussed above, the third prong of the "cigarette rule" requires a finding of "substantial injury to consumers, [competitors or other CT Page 16535 businessmen]." "In discussing the third criterion, the federal trade commission has stated: The independent nature of the consumer injury criterion does not mean that every consumer injury is legally "unfair" however. To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided." (Emphasis omitted; internal quotation marks omitted.) A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 216,579 A.2d 69 (1990).
The plaintiffs have the burden of proof on this issue. According to Exhibit 2, the defendant was not entitled to be paid for the insurance claim services which were provided. As stated, this does not mean that those services and those provided in planning for the new house had no value. In the context of CUTPA's third prong, the plaintiffs must remove from speculation the question of valuation of the "countervailing benefits" they received. While, as noted, the court questions the valuation presented by the defendant,[12] it is the plaintiffs' burden on this count to show the value of those benefits. Under the circumstances here, the plaintiffs have not shown that the countervailing benefits they received as a result of their relationship with Statewide did not outweigh their injury.
In the sixth count, the same claimed representations concerning drawing up the necessary documents which are the subject of the third count, discussed above, are pleaded as a premise for a CUTPA violation. Since the court has determined that the plaintiffs have not proved their allegations under the third count, their CUTPA claim in the sixth count was also not proved. Judgment may enter for the defendant on the fourth, fifth and sixth counts.[13]
 B. Defendant's Counterclaim
As noted above, the defendant withdrew her second and third counterclaims. In her first counterclaim, the defendant claims that the Fieldings are liable to her for breach of contract, in the total amount of $116,265.00. She claims that the plaintiffs accepted the breakdown, Exhibit 8, as evidenced by the payment of the deposit, and engaged her services. See Hoye v. The Dewolfe Co., 61 Conn. App. 558, 563-564,764 A.2d 1269 (2001).
As stated above, the court has found to the contrary. Exhibit 2, the multi-services contract, contemplated a later work agreement and specifications "based upon agreement with owner(s)." The breakdown was never accepted. When she paid the deposit, it was expressly confirmed to CT Page 16536 Susan Fielding that it was a "good faith deposit," as evidence of the parties' intent to work out a contract. The implication was that if the issues were not resolved, the deposit would be returned. No binding agreement was created thereby. Whitney Fielding expressly told Peter Ranciato to do no work and that he was consulting an attorney in order to prepare a contract which would protect the Fieldings' interests. The parties never agreed to terms under which the defendant was engaged to build the new house. Accordingly, the defendant may not recover for breach of contract. Judgment may enter for the plaintiffs on the defendant's counterclaim.
 CONCLUSION
For the foregoing reasons, judgment may enter for the plaintiffs on the first and second counts of the complaint. The court finds that the defendant is liable for the amount of the deposit, $25,000.00, plus interest, in the amount of $15,479.50, for a total of $40,479.50. Judgment may enter for the defendant as to counts three, four, five, and six. Also, judgment may enter for the plaintiffs on the defendant's counterclaim. It is so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT